IN THE UNITED STATES DISTRICT COURT FOR THE **FILED**
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION        **98 JUL 29 PM 3: 24**

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| DIAGNOSTIC HEALTH SYSTEMS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.          ) | CIVIL ACTION NO.  96-G-2807-S |
| ) | |
| APPLIED DIAGNOSTIC SYSTEMS, INC.;) | |
| CORRECTIONAL MEDICAL SERVICES, ) | |
| INC.; RANDY DUPREL; JAMES L. ) | |
| CHAMBERS; and LLOYD GATHERUM, ) | **ENTERED** |
| ) | |
| Defendants. ) | **JUL 2 9 1998** |

MEMORANDUM OPINION

STATEMENT OF FACTS

On August 9, 1994, the Alabama Department of Correc-
tions of the State of Alabama awarded a contract to Correctional
Medical Services, Inc. [hereinafter CMS], effective November 4,
1994, to provide medical services for its state prison popula-
tion.  In an effort to save the State Department of Corrections
money and reduce risks of transporting inmates to facilities with
x-ray equipment,[1] CMS subcontracted the radiological or x-ray

_____

[1]  Some prison facilities had permanent x-ray equipment.
Others had no x-ray equipment, which necessitated the transport-
ing of prisoners located therein to other facilities within the
state when x-rays were needed.

113

portion of the contract to Diagnostic Health Systems, Inc.
[hereinafter DHS], to provide portable x-ray equipment for the
prison system for one year.

Negotiations for the subcontract between CMS and DHS
began at a trade show in the summer of 1994 at which time Hal
Apel, DHS's director of corrections, introduced himself to Lloyd
Gatherum, regional director for CMS, who was in the process of
moving to Alabama as CMS regional manager.  Mike Roberts, DHS
regional manager for Tennessee, and DHS owners Norman Goldhecht
and Fred Brotz were also present at the convention.

Following the convention, negotiations between CMS and
DHS continued.  At some point Apel met with Goldhecht and Brotz
to reduce to writing the proposed fee schedule for DHS's furnish-
ing diagnostic services on the Alabama contract.  In December
Roberts and Apel came to Alabama to meet Gatherum at CMS's
Birmingham office to offer Brotz's "blitz" approach.[2]

When Roberts resigned from DHS shortly thereafter, Jim
Chambers was hired to fill his position as DHS regional manager
for Tennessee.  Defendant Chambers claims he was fraudulently
induced into signing a contract with plaintiffs.  As part of his
job, Mr. Chambers[3] was responsible for closing the DHS/CMS deal.

---

[2]  Brotz's "blitz" approach was an approach by which DHS
would offer more services than would be called for.

[3]  Mr. Chambers had been trained as a x-ray technician in
the military.

According to Chambers Brotz promised him a commission on the gross revenue from the contract if Chambers closed the deal and that his compensation arrangement would be put in writing.  The form employment contract he received, however, only had the signatures of Brotz and Goldhecht on the last page with blanks in all other places.  Significantly, portions of the contract pertaining to hours, compensation, and territory were left blank. Although Chambers signed the blank contract[4] with the understanding that DHS would complete the contract, no provision was made for his compensation arrangement in the contract[5] and the parties disagree about the arrangement reached.  Brotz denied having offered Chambers a commission on the Alabama prison contract, but says he offered Chambers a salary increase once the Alabama contract turned a profit.

The wording of the form "employment contract" in section I dealing with the geographical territory to be covered by Chambers, blank when signed by Chambers, was filled in with the following words:

> Tennessee, Alabama **& all other areas as directed by the President and or Vice President.**

---

[4]  Chambers maintains he was forced into signing the contract.

[5]  A schedule entitled "Exhibit A" setting forth compensation terms was to have been attached to the contract.  It was not.

3

Elsewhere in section IX of the "contract" the wording reads as follows:

> This covenant not to compete shall apply to Employee's sales territory designated in this agreement, the entire State of New Jersey, and a geographical area within 20 miles of the outer boundary of Employee's sales territory.

In early January 1995 Chambers introduced himself to Gatherum as Roberts' replacement. Later in the month on January 24, 1995, Chambers, Apel and Gatherum met at the Birmingham CMS office, with Apel indicating that he could have the entire state subcontract up and running within 60 days.

On February 8, 1995, Apel signed Chambers' name to another DHS/CMS proposal. CMS accepted and incorporated the proposal into an agreement with a starting date of March 27, 1995. By the agreement DHS would be the exclusive provider of mobile x-ray services. CMS would make other arrangements to service inmates off-site or if DHS were unable to provide on-site services. DHS's ultimate goal was "to implement a worry free radiology service and perform as many services on site [sic] as to inhibit off-site clinical services." It would attain its goal by the use of mobile diagnostic testing performed by board certified radiologists and cardiologists and registered, licensed, and security cleared technologists, using state of the art radiology and ultrasound equipment certified and inspected by the state of Alabama. By the agreement DHS would provide a verbal report within 12 hours, a written report within 48 hours,

4

and specifically design and provide a quality assurance manual
for each facility.

Pursuant to the agreement DHS hired Randy Duprel in
March 1995 as regional manager to act as liaison between DHS and
CMS.[6] Duprel was responsible for DHS's x-ray machine certifica-
tion or registration with the Alabama Radiological Health
Department, as well as qualifying DHS to conduct business in
Alabama as a foreign corporation.

Contradictory evidence has been presented to the court
concerning Duprel's immediate supervisor.  DHS claims that
Chambers was Duprel's direct supervisor.  Apel's affidavit filed
in response to CMS's motion to dismiss stated that Apel was
Duprel's direct supervisor.

A chief technologist and an office manager were to be
put in place to help the regional manager achieve a successful
radiology system.[7]  The technologists and radiologists with

---

[6]  Duprel had been working for CMS as an x-ray technician
prior to the time of the subcontract.

[7]  There is dispute as to the actual meaning.  CMS believed
this to mean that the office manager and chief technologist would
be located in Alabama.  Don Gough, chief technologist, and Vicki
Levy, office manager, were in fact located 1,500 miles away in
New Jersey.

acceptable records serving CMS at the time of the subcontract[8] would have first right of acceptance of DHS employment.[9]

In early March 1995 Duprel contacted the state of Alabama about requirements for doing business in the state. By letter of March 17, 1995, Mr. William Eden of the Alabama Radiological Department replied by letter with enclosures of the Alabama Code pertaining to portable x-ray equipment and an "Application for Registration of Radiation Sources."

DHS began conducting portable x-ray services using a 12.5 milliamperage "Phantom" x-ray machine in Alabama in March 1995, admittedly well before its statutorily-required registration form[10] was sent to the state.  Its application, minus the required attached plan, for registration was not sent until April 11, 1995.

Not only did DHS begin its operations in Alabama prior to the time of its required registration with the state, it began its operation before state certification or inspection.  Consequently, on April 26, 1995, Eden sent a "cease and desist"

---

[8]  Cahaba Imaging was the radiologist group used by CMS at the time of the agreement.  DHS knew this, but did not retain Cahaba's personnel.

[9]  CMS had been using Cahaba Imaging for the radiology work and had been satisfied with their performance.

[10]  Ala. Admin. Code § 420-3-26 deals with radiation control. Rule 420-3-26-.05 provides for the registration of x-ray producing machines.

notice relating to the portable x-ray equipment to Gough.   An
accompanying letter informed him that the DHS application had
been denied because of failure to provide adequate information
about the machine and its usage.   The equipment would not be
authorized for usage until such time as the information had been
submitted to and evaluated by the state.   DHS stopped use of the
portable x-ray equipment in May 1995.   Its use was never rein-
stated by DHS prior to the time the contract was terminated in
August 1995.

        DHS acknowledged receipt of the letter from Eden.
Thereafter, Duprel carried a portable machine to Eden's office
for inspection.   The inspection prompted a May 15, 1995, letter
from Eden's supervisor Kirksey Whatley, director of the division
of radiation control, criticizing the equipment and its perfor-
mance, noting that the Phantom 12.5 mA mobile X-ray equipment was
"inadequate for exams listed in the protocol submitted due to the
limitations of 12.5 mA maximum, which leads to lengthy exposure
times resulting in repeated exposures because of motion blurring
the image."   The letter listed six items of noncompliance with
"Chapter 420-3-26, Radiation Control, Alabama Administrative
Code" and requested a written response from DHS within 30 days.

        When Brotz received Whatley's May 15, 1995, letter he
informed Apel to respond quickly.   Apel's "quick" response was by
letter of June 14, 1995.   Gatherum thereafter wrote a letter on

                                7

CMS letterhead to Eden on behalf of DHS's use of portable x-ray machines in certain correctional facilities.

By the end of May Gatherum brought complaints concerning DHS's failure to provide ultrasound equipment and fulfill other items in their agreement to the attention of Chambers.

On May 2, 1995, Gough sent a written response to the State Department of Health providing information on one of the seven areas of inquiry in Eden's earlier letter of March 17, 1995,[11] and setting forth Duprel's training experience on DHS's Phantom portable x-ray machine.  The next day Apel sent a letter to Eden, with input from Brotz, apologizing for the delayed response and acknowledging the April 26, 1995, cease and desist order.

On July 12, 1995, Chambers and Duprel met Whatley at the department of health's radiation bureau office in Montgomery, Alabama, to discuss the cease and desist notice and the problems DHS was having in obtaining certification of its portable x-ray equipment.  At that time Whatley instructed Chambers that DHS must purchase or use portable x-ray machines with a higher "mA" or milliamperage standard to cut patient radiation exposure.  DHS was to bring prison facility x-ray rooms into compliance with state scatter control and shielding regulations.

--------

[11]   Response to Section 420-3-26-.06(3)(d) regarding proper instruction in the safe operating procedures and competence in the use of portable equipment.

Within a week, on July 16, 1995, Chambers resigned his Alabama DHS position, but continued working for DHS in Tennessee. His only contact with Alabama after that date was to introduce Duprel to Gatherum as the DHS contact person on July 28, 1995. During the meeting Gatherum expressed frustration over DHS's failure to perform the contract.

By letter of July 18, 1995, Eden again informed DHS that the information submitted regarding radiation shielding details was insufficient.

Following the July 28, 1995, meeting with Gatherum, Duprel, and Chambers, Duprel reported to Goldhecht and Apel describing the areas of Gatherum's dissatisfaction--dissatisfaction confirmed by deposition testimony of Chambers[12] and Brotz.[13]

On August 1, 1995, Gatherum notified Apel by letter that DHS had 30 days in which to comply with the contract before CMS terminated the contract for DHS's noncompliance.  The letter listed seven areas of noncompliance.

On August 7, 1995, Duprel and Chambers met with Gatherum for the second time.  Chambers believes that this was the first time he and Duprel were shown the "30-day letter."

---

[12]   Chambers verified Duprel's report that Gatherum was frustrated with DHS's lack of performance under the contract and verified that DHS was not providing a contractual 12 hour turn-around on verbal x-ray reports as promised.

[13]   Brotz admitted that DHS had been unable to provide a typed "hard report" within the stated time frame.

9

Following the July 28, 1995, meeting Chambers and Duprel began discussing the possibility of starting their own company--one to provide radiological and diagnostic services to nursing homes and other areas. After seeing the "30-day letter," Chambers felt that their new business could contract with CMS if DHS failed to cure the contract and the DHS/CMS contract were terminated.

Brotz responded to the Gatherum's "30-day letter" by letter of August 17, 1995.[14] The letter acknowledged that DHS would have to come into compliance by September 1, 1995, and addressed the issues raised therein. Although Brotz stated that two new x-ray machines had been ordered, the purchase was not completed and no "order" documentation was produced. The letter required a response from Gatherum by noon on August 21, 1995, as to whether the contract would be continued.

There is conflicting evidence as to whether CMS gave a response to Brotz's letter. After several telephone calls to the CMS office on August 21, 1995, Gatherum's secretary, Nancy Neighbors, told Kathy Snider of DHS that the contract was canceled.

On September 1, 1995, CMS entered into a radiology subcontract with Applied Diagnostic Systems [hereinafter ADS], the newly formed Chambers/Duprel company, to provide radiology

---

[14]   Duprel had been fired by the date of this letter.

10

service to Alabama's prison population.  ADS hired some of DHS's
former x-ray technicians and a physicist to help with state
certification of their portable x-ray machines[15] and compliance
with state regulation, including building and installing radia-
tion shields at the prison x-ray facility rooms.

ADS continues to perform the contract with the
state.

DHS filed suit in federal court October 25, 1996.  The
action is presently before the court on cross motions for summary
judgment.

## SECTION 232 OF ALABAMA CONSTITUTION AND PARALLELING STATUTES

The Alabama Constitution prohibits a foreign corpora-
tion from conducting business in Alabama without being qualified
to do so by a certified copy of its articles of incorporation
with the secretary of state.  Ala. Const. of 1901, Article XII,
§ 232, as amended by amend. 473,[16] Foreign corporation doing
business in state.[17]  Plaintiff did not qualify to do business in
Alabama until December 23, 1996.  Although its certificate of

---

[15] ADS's portable x-ray machines were not Phantom machines
and were not used on patients prior to their certification.

[16] Amended in 1988.

[17] Alabama courts have held that this provision is self-
executing.  *New England Mtg. Sec. Co. v. Ingram*, 91 Ala. 337, 9
So. 140 (1891).

11

good standing was issued March 31, 1998, it has yet to fulfill
the requirements of Alabama Code § 10-2B-15.02(d).[18]

Paralleling section 232 is Ala. Code § 10-2B-15.01 (a):
"A foreign corporation may not transact business in this state
until it obtains a certificate of authority from the Secretary of
State."  Subsequent sections of the code deal with offending
parties.  Pertinent to the case at bar is Ala. Code § 10-2B-
15.02(a) (1997 cum. supp.), commonly referred to as Alabama's
"forum" or "door-closing" statute, a portion of which follows:

> (a) A foreign corporation transacting business in
> this state without a certificate of authority or with-
> out complying with Sections 40-14-1[19] to 40-14-3,[20]
> inclusive, 40-14-21,[21] or 40-14-41,[22] may not maintain a

---

[18]  "A foreign corporation transacting business in this
state without a certificate of authority shall be liable to this
state, for the years or parts thereof during which it transacted
business in this state without a certificate of authority, in an
amount equal to treble the amount of all fees and taxes that
would have been imposed upon such corporation had it duly applied
for and received a certificate of authority to transact business
in this state as required by this article and thereafter filed
all required reports, plus all interest and penalties imposed for
failure to pay such fees and taxes."

[19]  Section 40-14-1.  Foreign corporation must file a
qualification fee or admission fee prior to engaging in or
transacting any business in this state.

[20]  Section 40-14.2.  Certificate of incorporation must be
filed in the office of the Department of Revenue.

Section 14-14-3.  Payment of admission fee but once.  The
payment does not relieve the foreign corporation from the duty of
complying with requirements of existing laws and the payment of
other taxes.

[21]  Section 40-14-21.  Foreign corporations required to
procure a permit from the Department of Revenue when admitted to

proceeding in this state without a certificate of
authority.

Prior to the August 1, 1995, effective date of the
above statute, the statute that was in effect when the CMS/DHS
contract was entered into read as follows:

(a)   A foreign corporation transacting business in this
state without a certificate of authority or without
complying with Sections 40-14-1 through 40-14-3, 40-14-
21, or 40-14-41 may not maintain a proceeding in any
court in this state until it obtains a certificate of
authority, complies with Sections 40-14-1 through 40-
14-3, Section 40-14-21 and Section 40-14-41, and dis-
charges its liability under subsection (d) hereof.[23]

The evidence before the court shows that plaintiff did
not qualify to do business in Alabama until after the lawsuit was
filed and nearly two years after it began doing business in the
state.   In *Sanjay, Inc. v. Duncan Construction Co., Inc.*, 445 So.
2d 876, 879 (Ala. 1983), the Alabama Supreme Court held that a
foreign corporation which did not qualify to do business in
Alabama on or before the date on which the contract was made was
not entitled to enforcement of the contract by the Alabama
courts.   *Sanjay* referred to the law of Alabama, as set forth,
quoting a portion of *Sea Scaping Const. Co., Inc. v. McAtee*, 402

---

do business in and prior to transacting any business in this
state and annually thereafter.

[22]   Section 40-14-41.   Levies a franchise tax on
corporations doing business in this state.

[23]   Section (d) provides for the payment of treble damages
to the state for transacting business in the state without a
certificate of authority.

So. 2d 919 (Ala. 1981), which noted that the Alabama law had been

"affirmed repeatedly." 402 So. 2d at 880. The court recognized

its "duty to uphold the principles established by our Constitu-

tion and statutes" by concluding with the following:

> Our Constitution and statutes have created a bar
> precluding *enforcement* of contracts made by foreign
> corporations that failed to qualify before and at the
> date of the contract, where the contract is to be
> performed in Alabama. *Sea Scaping Const. Co., Inc. v.*
> *McAtee*, 402 So. 2d 919 (Ala. 1981); *Cable Piano v.*
> *Estes*, 206 Ala. 95, 89 [So.] 372 (1921).

445 So. 2d at 881. *See also*, *Advance Industrial Security, Inc.*

*v. William J. Burns I. D. Agency*, 377 F.2d 236, 238 (5th Cir.

1967) (Held that Advance could not found its claim on contracts

void *as against* public policy, noting that the corporation was

doing business in the state in violation of section 232 of the

Alabama constitution.)

In *Eastern Shore Marine, Inc. v. M/V Mistress*, 717 F.

Supp. 790 (S.D. Ala. 1989), the court held that Alabama's quali-

fication statute, which voids contracts by foreign corporations

lacking authority to transact business in the state, as well as

the Alabama constitution and Alabama Supreme Court decisions,

barred counterclaim, the Alabama law being *mandatory*. *Cf. New*

*Concept Industries, Inc. v. Green*, 646 F. Supp. 1077, 1078 (M.D.

Ala. 1986) (Alabama law provides that a foreign corporation not

qualified to do business in this state may not enforce its

contracts but can have its contracts enforced against it.)

14

The laws barring a foreign corporation not qualified to do business in the state from enforcing its contracts apply only to corporations engaged in contracts *intrastate* in nature. *Wallace Const. Co., Inc. v. Industrial Boiler Co., Inc.*, 470 So. 2d 1151, 1152 (Ala. 1985). *See also Delta Const. Corp. v. Gooden*, 1998 WL 196380, 2 (Ala., Apr. 24, 1998) (It is "settled that a construction contract supplying both material and labor, ... is an example of the kind of contract that is considered *intrastate*, even though some of the material and labor is pro- cured outside the state (emphasis added)."); *Building Maintenance Personnel, Inc. v. International Shipbuilding, Inc.*, 621 So. 2d 1303 (Ala. 1993); Sanwa *Business Credit Corp. v. G. B. "Boots" Smith Corp.*, 548 So. 2d 1336, 1341 (Ala. 1989) (Held that foreign corporation engaged in a combination of labor and construction in a **service** contract prevented it from proceeding in the Alabama court system "to recover under any theory sounding in contract." *Sanwa* refers to *Sanjay*, previously mentioned,[24] in which the court refused to accept Sanjay's argument that it was engaged in *interstate* commerce, saying there was a difference between "'contracts requiring only the furnishing of materials, and contracts requiring the seller to perform construction

---

[24]   See pages 13-14 of this opinion.

15

activities.'"  548 So. 2d at 1340-41.  The court cited *Greentree Acceptance, Inc. v. Blalock*, 525 So. 2d 1366 (Ala. 1988), for the position that *intrastate* activity is to be decided on a case by case basis.  525 So. 2d at 1370.

In the case at bar the court rejects plaintiff's argument that the case is an *interstate* commerce one.  The service involved in the contract at issue was provision of x-ray services to prisons--all lying within the state of Alabama.  As in *Wise v. Grumman Credit Corp.*, 603 So. 2d 952 (Ala. 1992), plaintiff established a "continuing presence in the state over and above the mere shipping of commodities between the states." *Id.*, at 953.  The Alabama Supreme Court in *Wise* went on to state that when a contract of a foreign corporation not qualified to do business in the state has been barred by the Alabama constitution and statutes "the case[s] ha[ve] involved the performance of some type of service or labor within the state other than services or labor that could reasonably be argued to be incidental to an interstate sale."  *Id.*  Furnishing x-ray services to Alabama prisons located within Alabama can only be classified as "incidental to an interstate sale."  Furnishing x-ray services to Alabama prisons located wholly within the state is a service-- nothing more.  The action is localized in Alabama.

16

Alabama has taken enforcement of section 232 a step further.  In *Boles v. Midland Guardian Co.*, 410 So. 2d 82 (Ala. Civ. App. 1982), the court held that a lender could not prosecute to judgment an action in detinue **in which proof necessitated reliance upon an illegal contract either made in Alabama or to be performed in Alabama.**  Summing up the facts of *Boles* by quoting *Shiloh Construction Co. v. Mercury Construction Corp.* 392 So. 2d 809 (Ala. 1980),[25] the court said: "'The gist of this court's holding was that, any way you slice it, the action was ex contractu.'"  410 So. 2d at 84. The court held that although *Boles* was an action in detinue, it could not be proved without depending upon the contract between the plaintiff and defendants. The action was "an enforcement of the rights derived from the contract."  410 So. 2d at 84.  *See, Alabama Western R. Co. v. Talley-Bates Construction Co.*, 162 Ala. 396, 50 So. 341 (1909) (A foreign corporation not qualified to do business in Alabama could not enforce its contract *or any rights dependent upon it* in the courts of the state.).

*Boles* succinctly stated the law when it stated the following:

> Where the contract is to be performed in this state, although not entered into here, and in the performance the nonresident corporation must engage in business in this state, although the contract is valid, the policy of the state, as evidenced by the

_____

[25] *Shiloh* did not permit a fraud action in procurement of a contract to proceed, ruling that it stemmed from the underlying contract.

17

Constitution and statutes, compels the courts of the
state to refuse their aid to such offending corporation
in the enforcement of such contract or *recovering the
benefits accruing thereunder.*   (Emphasis in *Boles.*)

410 So. 2d at 85 (citing *Lee v. Great Northern Nekoosa Corp.*, 465
F.2d. 1132, 1136 (5th Cir. 1972) which in turn cited *Alexander v.
Ala. Western R. Co.,* 179 Ala. 480, 60 So. 295 (1912), and *Ala.
Western R. Co. v. Talley-Bates Const. Co.*, 162 Ala. 396, 50 So.
341 (1909)).

The court was faced with application of its two forms,
of its "forum closing statute," as in the instant case, in *Delta
Construction Corporation v. Gooden,* 1998 WL 196380 (Ala.,
April 24, 1998).  In deciding that the construction of a 40-bed
personal care facility in Lee County, Alabama, involved *intra-
state* rather than *interstate* commerce, the court, at 3, cited
language from *S & H Contractors, Inc. v. A. J. Taft Coal Co.*, 906
F.2d 1507, 1513 (11th Cir. 1990), *cert denied*, 498 U.S. 1026, 111
S. Ct. 677, 112 L. Ed. 2d 669 (1991), set forth below:

[The operations of S & H, an unqualified foreign corpo-
ration engaging in the construction business in
Alabama] were sufficiently localized in Alabama to
allow Alabama courts to enforce the forum-closing

statute[26] against S & H without offending the federal
commerce clause.

*Delta* parallels the instant case in another aspect.  As
in the case at bar, Delta did eventually obtain a certificate of
authority to do business in Alabama, paying the necessary admis-
sion tax, permit fee, and franchise tax, but did not fully comply
with § 10-2B-15.02(a) and (d).  In ruling that Delta could not
invoke the aid of Alabama's courts to enforce the arbitration
provision of the contract because of its noncompliance with
Alabama law, the court stated the following:

> The record does not establish, however, that Delta has
> fully complied with § 10-2B-15.02(a) and (d), which
> together, require that a previously nonqualified for-
> eign corporation, as a prerequisite to enforcing a
> contract in this state, pay to the state "an amount
> equal to treble the amount of all fees and taxes that

---

[26]  This is a reference to the application of the forum-
closing statute that was in effect when Delta and Gooden entered
into their contract and not the amended statute.  In the case at
bar plaintiff has directed the court to the January 13, 1998,
order entered by Judge Tennant Smallwood of the Tenth Judicial
Circuit in the consolidated cases of *Bell v. Fox Television
Stations*, CV 96-4630, and *Fox Televisions Stations v. Allbritton
Birmingham Corporation*, CV 96-4671, in which the judge ruled that
the statute in effect at the time of the making of the contract
controlled.  By both *Delta* and *Bell* holdings plaintiff is
responsible for paying treble damages.  DHS has not paid the
state of Alabama treble damages even though the record shows that
early on in the proceedings plaintiff was given the opportunity
to pay the damages and it never has.  The court is not swayed by
the argument that the bureaucrats at the Alabama State Department
of Revenue could not calculate the amount owed.  This court is
not bound by their administrative inadequacy.  Plaintiff could
have easily calculated the damages and sent a check to the state.
By failing to pay damages called for by statute DHS continued to
be without right to enforce its contracts in the courts of
Alabama.

19

> would have been imposed upon such corporation had it
> duly applied for and received a certificate of author-
> ity to transact business in this state as required by
> [law]."

*Delta*, at 5.

Following *Delta*, it is immaterial that the plaintiff
eventually obtained a certificate to do business in Alabama.  The
record is void of any evidence that DHS ever complied with
§ 10-2B-15.02(a) and (d), nor does plaintiff argue that it did.
The court holds that DHS cannot invoke the laws of this state to
enforce the contract because of its noncompliance with state law.

In light of the rulings discussed above it is unneces-
sary to address at length plaintiff's argument that section 232
may not serve as a basis for striking plaintiff's claims unless
section 10-2B-15.02 is declared unconstitutional.  Alabama case
law clearly shows section 232 of the Alabama constitution and
10-2B-15.02 of the code to be compatible.  Even were they not,
the state constitution cannot be amended by statute.  Further-
more, plaintiff's argument that an Alabama statute may not be
declared unconstitutional without notice to and participation by
the Alabama Attorney General is error.  This principle does not
apply to federal courts.  Thus, this constitutionality question
raised by plaintiff is a nonissue, as is plaintiff's argument
that the clean hands doctrine undermines the defense of lack of
qualification.  The clean hands doctrine is a defense in equity
only.  The claims before the court sound in law, not equity.

20

HOLDINGS

## HOLDING I--FURNISHING X-RAY SERVICES TO ALABAMA PRISONS LOCATED WHOLLY WITHIN[27] THE STATE IS AN *INTRASTATE* SERVICE-- NOTHING MORE

## HOLDING II- SUMMARY JUDGMENT FOR PLAINTIFF ON COUNTERCLAIMS

Alabama law is clear that a foreign corporation not qualified to conduct business in Alabama cannot bring suit on its contracts here. This rule, however, does not prevent plaintiff from defending itself against the counterclaims brought by defendants Applied Diagnostic, Randy Duprel, and James Chambers. Having considered plaintiff's motion for summary judgment on these counterclaims the court holds that plaintiff's motion for summary judgment on the counterclaims is due to be granted.

## A.    COUNT I--FRAUD--SUMMARY JUDGMENT FOR PLAINTIFF

This claim is in reality an attempt to convert a contract claim into one for fraud and does not state a claim for which relief can be granted. The record is void of any evidence that plaintiff intended to defraud defendants at the time of contracting--no present intent not to perform or present intent to deceive evident. (Even were such evidence present ADS cannot

---

[27]    See discussion on pages 15-16 of this opinion.

sue DHS because it did not fulfill claims made to others.  It was not party to the contract.)  The court grants plaintiff summary judgment as a matter of law.

B.    COUNT II--BREACH OF CONTRACT--SUMMARY JUDGMENT FOR PLAINTIFF

As will be discussed at length later in this opinion Chambers and Duprel were at-will-employees.[28]  They did not have a contract with plaintiff.  Consequently they are unable to sue on contracts they did not have.  The court grants plaintiff summary judgment on this count as a matter of law.

C.    COUNT III--WORK AND LABOR--SUMMARY JUDGMENT FOR PLAINTIFF

Defendants have offered nothing in support of this claim.  Chambers was compensated for his services at a salary which he does not contend was unreasonable.  Duprel, too, was compensated for his services.  There is no evidence he felt his compensation objectionable.  Having compensated both men plaintiff was not unjustly enriched by their services.  Accordingly, the court grants plaintiff summary judgment on defendants' claim for work and labor as a matter of law.

---

[28]   See HOLDING VIII beginning on page 29 relative to claim for breach of restrictive covenants.

22

D.   COUNT IV--WRONGFUL INTERFERENCE WITH BUSINESS RELATIONS

This is not a recognized claim in Alabama.[29]  Even if Alabama did recognize this claim there is no evidence of interference by plaintiff causing defendants' loss of contract rights or damages.  The court grants plaintiff summary judgment on this count.

E.   COUNT V--WRONGFUL INTERFERENCE WITH CONTRACTUAL RELATIONS

It is impossible for plaintiff DHS to interfere with the contractual relations it had with its own employees, Chambers and Duprel.  There is no evidence that plaintiff interfered with the business relations between Duprel and Chambers.  The court grants plaintiff summary judgment as a matter of law on this count.

F.   COUNT VI--UNFAIR COMPETITION--SUMMARY JUDGMENT FOR PLAINTIFF

Alabama does not recognize the tort of unfair competition.[30]  The court grants plaintiff summary judgment as a matter of law on this count.

_____

[29]  A discussion of wrongful interference with business relations is included later in the opinion at HOLDING IV discussion beginning on page 25.

[30]  Discussion of tort follows later in opinion at HOLDING XIV beginning on page 39.

23

G.   COUNT VII--BUSINESS DEFAMATION--SUMMARY JUDGMENT FOR PLAIN-
     TIFF

          There is no evidence of business defamation[31] before

the  court.   Truth is a defense to anything plaintiff might have

said about the unethical, reprehensible, but not unlawful,

behavior of defendants in setting up a competing business.  The

court grants plaintiff summary judgment as a matter of law.


HOLDING III--BREACH OF CMS/DHS CONTRACT--SUMMARY JUDGMENT FOR
            DEFENDANTS

          Since a foreign corporation cannot maintain a suit in

Alabama on its Alabama contract until it has first qualified to

do business here, the court grants summary judgment *sua sponte* on

all counts of the complaint dependent on breach of the CMS/DHS

contract or requiring proof of that contract.  Plaintiff had

notice of the court's intention to enter such a ruling by tele-

phone conference of May 1, 1998, and letter of May 6, 1998, and

had the opportunity to respond.[32]   At the May 1, 1998, confer-

ence, counsel was notified of the court's intention to certify to

the Eleventh Circuit an interlocutory appeal of its *sua sponte*

ruling based on Alabama's constitution and paralleling statutes

---

          [31]  Discussion of business defamation follows later in
opinion at HOLDING XV beginning on page 40.

          [32]  By confirmation letter of May 6, 1998, made a part of
the record, counsel was notified that it had the opportunity to
respond to the proposed ruling.

prohibiting a foreign corporation from bringing suit on an
Alabama contract until it has qualified to do business in the
state.[33]

HOLDING IV--COUNT I--TORTIOUS INTERFERENCE WITH BUSINESS
          RELATIONS--SUMMARY JUDGMENT FOR DEFENDANTS ADS, DUPREL
          CHAMBERS AND GATHERUM

        The four elements of this cause of action are: 1) the
existence of a contract or business relation; 2) defendant's
knowledge of the contract or business relation; 3) intentional
interference by the defendant with the contract or business
relation; and 4) damage to the plaintiff as a result of the
defendant's interference. *Fossett v. Davis*, 531 So. 2d 849 (Ala.
1988) (citing *Lowder Realty Inc. v. Odom*, 495 So. 2d 23, 25 (Ala.
1986).  To prove the tort the plaintiff must prove the existence
of the contract.  Such proof necessitates reliance upon a con-
tract not enforceable by the Alabama courts.  Pursuant to *Boles*,
410 So. 2d 82 and *Talley-Bates*, 50 So. 341, discussed previously,
since plaintiff was not qualified to conduct business in Alabama
it cannot enforce any rights dependent upon the contract in the
state courts of Alabama.

        Even were plaintiff not prohibited from proceeding
against individual defendants Duprel and Chambers for the above

---

[33]  This opinion and accompanying order dispose of all
issues in the case.  Because a final judgment is being entered it
is not necessary to certify questions to the Eleventh Circuit.

reason, it is well settled law that a principal's agent or employee who acts for or on behalf of the principal is a party to that principal's contractual and business relations and cannot be held liable for interference with that relation. *Harrell v. Reynolds Metals Co.*, 495 So. 2d 1381, 1388 (Ala. 1986). Hence, DHS has no cause of action against these individual employees.

As a party to the contract CMS cannot be held liable for intentional interference with its contract with DHS and is not named as a defendant in this count.

The court holds that defendants are due summary judg-ment as a matter of law on count I of the complaint--tortious interference with business relations.

## HOLDING V--COUNT II--CONSPIRACY--SUMMARY JUDGMENT FOR DEFENDANTS ADS, CMS, DUPREL, CHAMBERS AND GATHERUM

Under the conspiracy count plaintiff alleges that defendants ADS, CMS, Duprel, Chambers, and Gatherum conspired to deprive DHS of the benefits of the contract. For the reasoning set forth above, DHS may not enforce any rights in the Alabama courts associated with the contract or dependent upon it because it was not qualified to conduct business in Alabama. *Supra, Boles*, 410 So. 2d 82; *Shiloh*, 392 So. 2d 809; *Tally-Bates*, 50 So. 341. The court grants defendants summary judgment as a matter of law on count II of the complaint.

HOLDING VI--COUNT III--BREACH OF CONTRACT--SUMMARY JUDGMENT FOR
        DEFENDANT CMS

Since DHS cannot maintain suit on its contract with
CMS, the court grants defendant CMS summary judgment as a matter
of law on count III.   Section 232 Alabama Constitution.


HOLDING VII--COUNT IV--BREACH OF FIDUCIARY DUTY OF LOYALTY TO
        DHS--SUMMARY JUDGMENT FOR DEFENDANTS DUPREL AND
        CHAMBERS

Count IV of the complaint is a claim brought against
defendants Duprel and Chambers for breach of fiduciary duty of
loyalty to DHS when their actions in establishing a competing
firm caused DHS to lose the contract it had with CMS.  Although
the court views their actions as reprehensible it cannot hold
that their actions were responsible for DHS's losing its contract
with CMS.  DHS only is responsible for its loss.  It was DHS's
inaction or inability to perform or comply with the contract
conditions, set forth below, that brought about its loss:

  1)   DHS never qualified to conduct business in
       Alabama;

  2)   DHS never complied with Alabama statutes dealing
       with registration of x-ray equipment and radiation
       control and never rectified the six areas of non-
       compliance with radiation control set out in
       directives of the Alabama Division of Radiation
       Control;

  3)   DHS's equipment was never authorized for use
       within the state;

  4)   DHS failed to provide ultrasound equipment as per
       contract agreement;

5)   DHS had difficulty in supplying CMS the contrac-
     tual verbal reports within 12 hours of completion
     of procedures and failed to supply CMS the hard
     copy transcriptions of its x-ray findings within
     48 hours;

6)   DHS never complied with state scatter control and
     shielding device regulations; and

7)   DHS never ordered or provided machines cutting the
     patient radiation exposure time.

CMS provided DHS a grace period, ending on the last day
of August 1995 in which to comply with the contract or to have
the contract terminated.   Although it canceled the contract ten
days before the expiration of the grace period it would have been
impossible for DHS to rectify the conditions set by CMS and
fulfill the contract terms within the remaining ten days of the
grace period.   Plaintiff admits it could not have complied in
time.   DHS was going to be dropped from the contract regardless
of what Duprel and Chambers did.   CMS was under no obligation to
give plaintiff more time to comply with the contract, particu-
larly since plaintiff, the breaching party, had made no effort to
perform contract conditions.   Plaintiff deserved to be cut off
for using noncomplying x-ray machines in violation of Alabama
law.   Furthermore, there is no evidence DHS suffered any damages
resulting from these defendants' actions.   CMS was within its
rights to contract elsewhere for the services DHS had failed to
provide.

Since the court has ruled that pursuant to Alabama law
the plaintiff cannot bring a contract claim or anything relating

to it in the Alabama courts, since the evidence shows that DHS
itself was responsible for the loss of the contract, and since
the plaintiff has failed to prove any damages from the actions of
Duprel and Chambers, the court holds that defendants Duprel and
Chambers are entitled to summary judgment as a matter of law on
count IV of the complaint--breach of fiduciary duty of loyalty.

HOLDING VIII--COUNT V--BREACH OF RESTRICTIVE COVENANTS--SUMMARY
                JUDGMENT FOR DEFENDANT CHAMBERS

        In order for plaintiff to prove count V against defen-
dant Chambers--breach of restrictive covenants--it is necessary
for it to prove the existence of an employment contract with
Chambers.  Section 232 of the Alabama constitution precludes
plaintiff from suing on its employment contract with Chambers.
*Hughes Associates, Inc. v. Printed Circuit* Corp., 631 F. Supp.
851, 858 (N.D. Ala. 1986) (Strict construction of Alabama law is
that a nonqualified corporation that does business in Alabama
cannot enforce a contract in Alabama courts.); *Advance Industrial
Sec. v. William J. Burns I. D. Agency*, 377 F.2d 236, 238-39 (11th
Cir. 1967) (A contract made in the State of Alabama by a foreign
corporation not qualified to conduct business in Alabama is "void
at the suit of such foreign corporation" because its business has
been "carried on in violation of a legitimate and express state
policy."); C *& C Products, Inc. v. Premier Industrial Corp.*, 275
So. 2d 124, 131 (Ala. 1972), *appeal after* remand, *Premier Indus.*

*Corp. v. Marlow*, 292 Ala. 407, 295 So. 2d 396 (Ala. 1974), *cert. denied*, 419 U.S. 1033, 95 S. Ct. 515, 42 L. Ed. 2d 308 (1974), ("The public policy evidenced by our Constitution, statutes, and decisions is clear and to the effect that for a foreign corporation to gain benefits in our courts in contract actions, such corporation must first qualify to do business in this state in order that such corporation may be subject to the process of our courts, thus affording a mutuality of remedy between it and the citizens of this state."); *Calvert Iron Works, Inc. v. Algernon Blair, Inc.*, 227 So. 2d 424, 426 (Ala. 1969) ("This court has repeatedly held that when a foreign corporation [uncertified] comes into the State of Alabama, and does business in the State of Alabama, entering into contracts pursuant to such business, that such contract may not be enforced in the courts of this State.").

Even if plaintiff were not barred from suing on the "contract" because of section 232 the court holds additionally and alternatively that DHS did not have a contract with Chambers because of both vagueness and overbreadth of the "employment contract" itself.   In order for a contract to be in existence, its terms must be specific.   The DHS/Chambers employment contract did not specify compensation.   Although compensation was to have been set out in "Exhibit A" to the contract, there was no "Exhibit A."   Evidence before the court shows there was no contract

30

contents.  There is evidence of meeting of the minds to contract,
but this is not reflected in the written contract.  *McWilliams
v. American Medical Intern., Inc.,* 960 F. Supp. 1547 (N.D. Ala.
1997) (Formation of simple contract involves offer, acceptance,
and *consideration*.); *Hargrove v. Tree of Life Christian Day Care
Center*, 699 So. 2d 1242 (Ala. 1997) (Basic elements of contract
are an offer and acceptance, *consideration*, and mutual assent.).
The court holds DHS did not have an enforceable employment
contract with Mr. Chambers, there being no specific consider-
ation.  It does not matter what the parties intended, their
intentions were not reduced to writing and thus never completed.
The contract fails for vagueness.

Chambers was an employee-at-will under both Alabama and
Tennessee law.[34]  *See  Fulton v. Tennessee Walking Horse Breed-
ers' Association of America*, 63 Tenn. App. 569, 476 S.W. 2d 644,
625 (1971) (quoting 56 C.J.S. Master and Servant § 6c, pp. 68, 69
which states the general rule of contracts as follows:

---

[34]  Even if Tennessee law differed and were applicable under
a choice of law provision it would not be controlling.  In
*Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 507 (Ala.
1991), the court held that when the law of another state "'flies
directly in the face of the public policy of Alabama as set out
by statute,' the parties' choice of law could not be given
effect, and the law of Alabama, namely § 8-1-1, governed the
agreement (which contained a covenant not to compete) (citing
*Blalock v. Perfect Subscription Co.*, 458 F. Supp. 123 (S.D. Ala.
1978))."

31

> It is essential to the validity of a contract of
> employment that the nature and the extent of its obli-
> gations be certain.
>
> . . .
>
> As a general rule, it is essential that the contract
> specify the nature and extent of the services to be
> performed, the place where, and the person to whom,
> rendered, and the compensation paid, and a contract
> which does not specify any of the essential terms is
> unenforceable and void.

If a contract for employment is indefinite, it is construed to be

terminable at will in both states. Employment-at-will contracts

may be terminated by either party with or without cause or

justification. *Smith v, Reynolds Metals Co.*, 497 So. 2d 93, 95

(Ala. 1986). Whereas there was no employment contract in either

Alabama or Tennessee because of vagueness, defendant Chambers

cannot be liable for its breach of restrictive covenants.

Even were there an enforceable Tennessee contract, as

contended by plaintiff, Alabama frowns on covenants restricting

an individual from engaging in his livelihood. *See* Ala. Code

§ 8-1-1 (1993); *James S. Kemper & Co. S. E. v. Cox & Assocs.*, 434

So. 2d 1380 (Ala. 1983) (Contracts restraining employment are

disfavored because they tend not only to deprive the public of

efficient service, but tend to impoverish the individual);

*Associated Surgeons, P.A. v. Watwood*, 295 Ala. 229, 326 So. 2d

721 (1976) (The law looks with disfavor upon contracts which

restrain employment).

Not only has Alabama case law frowned upon covenants not to compete in employment contracts, this disfavor has been codified in Ala. Code § 8-1-1 (1993):  "(a) Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void."  Section 8-1-1 (b) allows for agreements not to compete between the parties within "a specific county, city, or part thereof."  While the Alabama Supreme Court has held that the territory of a noncompetition agreement "may properly include part of Alabama, all of Alabama, or 'more territory than the State of Alabama,' depending on the circum- stances," *Parker v. Ebsco Industries, Inc.*, 282 Ala. 98, 209 So. 2d 383 (1968), (cited in *Clark v. Liberty National Life Ins. Co.*, 592 So. 2d 564, 566 (Ala. 1992)), the "ultra broad," undefined territorial limits ("all other areas as directed by the President or Vice President") in the case at bar nullify the contract.  The territorial restriction in the instant case is over broad: Alabama, Tennessee, New Jersey and "all other areas as directed by the President or Vice President."  The Alabama Supreme Court interpretation of section 8-1-1 (b) does not extend it to areas falling within the discretion of the president or vice president of DHS.  In *Hill v. Rice*, 67 So. 2d 789 (Ala. 1953), in discuss- ing the validity of a noncompete agreement the court referred to

33

the following passage from 36 Am. Jur., *Monopolies, Combinations and Restraints of Trade*, p.554, sec. 78:

"Where the restraint is larger and wider than the protection of the party with whom the contract is made can possibly require, such restraint must be considered as unreasonable in law, and the contract which would enforce it is therefore void."

The court holds DHS did not have an enforceable employment contract with Mr. Chambers because it was overly broad in geographic scope, the overbreadth being prohibitive and burdensome. Since there was no employment contract because of overbreadth defendant Chambers cannot be liable for its breach of restrictive covenants.

For a covenant not to compete to be enforceable the employer must have a protectable interest that does not place an undue hardship on the employee. *Kemper,* 434 So. 2d at 1384. Both Chambers and Duprel were x-ray technicians by trade, having learned their trade elsewhere. They had only worked for plaintiff a matter of months, not having time to acquire or appropriate valuable trade information not within their knowledge at the time of employment. Nothing in the record indicates that DHS customer lists were confidential. "As stated in *Hill v. Liberty National Life Ins. Co.*, 259 Ala. 587, 67 So. 2d 789 (1953) an undue hardship exists when a restriction 'imposes on the employee [a] greater restraint than is reasonably necessary." *Clark v. Liberty National Life Ins. Co.*, 592 So. 2d 564, 567 (Ala. 1992).

34

Arguably, imposition of a noncompete agreement would pose undue
hardship on Chambers and Duprel were they restricted from engag-
ing in the trade in which they were skilled.

All of this discussion on vagueness, overbreadth and
undue hardship on Chambers presupposes that there was a enforce-
able, valid DHS/Chambers contract. The court has held there was
no valid contract. Chambers was an employee-at-will. There are
no covenants in employment-at-will arrangements.

The court grants defendant Chambers summary judgment on
count V of the complaint.

## HOLDING IX--COUNT VI--TORTIOUS INTERFERENCE WITH EMPLOYMENT RELATIONS AND RESTRICTIVE COVENANTS--SUMMARY JUDGMENT FOR DEFENDANTS ADS, CMS, DUPREL, AND GATHERUM

For there to be tortious interference with employment
relations and restrictive covenants with Chambers, as set forth
in count VI of the complaint, there must be a valid, enforceable
contract. "[T]he right to recover for the unlawful interference
with the performance of a contract presupposes the existence of a
valid contract." *Birmingham Television Corp. v. DeRamus*, 502 So.
2d 761, 766 (Ala. Civ. App. 1986). Having found the DHS/Chambers
contract not to compete unenforceable by plaintiff in Alabama and
Tennessee because of vagueness and overbreadth, and having found
the contract of employment to be nothing more than a contract at
will, DHS cannot litigate its claim of tortious interference with

35

employment relations and restrictive covenants with Chambers. Since a valid contract would have to be proved in order to have interference with it, the court grants defendants ADS, CMS, Duprel, and Gatherum summary judgment on count VI of the com- plaint.  Section 232 of the Alabama constitution and paralleling statutes prevent plaintiff from proving a valid contract. Chambers was a free agent--free to engage in business in Alabama.

HOLDING X--COUNT VII--TORTIOUS INTERFERENCE WITH PLAINTIFF'S EMPLOYMENT RELATIONS WITH DEFENDANT DUPREL--SUMMARY JUDGMENT FOR DEFENDANTS ADS, CMS, CHAMBERS AND GATHERUM

Count VII is a claim against defendants ADS, CMS, Chambers, and Gatherum for tortious interference with plaintiff's employment relations with defendant Duprel, said interference causing severe financial injury to DHS. Here again in order for plaintiff to recover, a valid enforceable contract with Duprel would have to be proved.  Not only did plaintiff offer no evi- dence that Duprel was anything other than an employee-at-will, DHS conceded that Duprel did not have an employment contract and did not sign a noncompete agreement.  There is no evidence of damage DHS sustained resulting from the actions of these defen- dants.  The court has ruled that plaintiff itself was responsible for the loss of the contract.

36

HOLDING XI--COUNT VIII--MISAPPROPRIATION TRADE SECRETS OF DHS—
        SUMMARY JUDGMENT FOR DEFENDANTS ADS, CMS, DUPREL,
        CHAMBERS AND GATHERUM

        Count VIII of the complaint claims defendants ADS, CMS,

Duprel, Chambers, and Gatherum misappropriated trade secrets of

DHS, causing it severe financial injury.  The Alabama Trade

Secrets Act is set forth in Ala. Code § 8-27-1 *et. seq.*  Section

8-27-2 of the code sets forth applicable definitions.  Section

8-27-3 defines misappropriation.  Although Alabama recognizes the

tort of misappropriation of trade secrets, there is no

statutorily-defined evidence of misappropriation before the

court.  Furthermore, Apel admitted in deposition that he did not

know of any trade secrets that were given or provided to CMS or

Gatherum by Duprel or Chambers.  Hence, because of plaintiff's

admission the court grants defendants summary judgment on this

count.[35]


HOLDING XII--COUNT IX--CONVERSION--SUMMARY JUDGMENT FOR
        DEFENDANTS ADS, DUPREL AND CHAMBERS

        Under Count IX, conversion, the plaintiff alleges that

defendants ADS, Duprel and Chambers converted valuable property

belonging to DHS to their use, causing severe financial injury to

plaintiff.  The court holds there is no evidence in the record to

---

[35]  By brief plaintiff "dismissed" this count.  A following
motion to dismiss the count was opposed.  The court denies the
motion, opting to rule on the merits.

sustain this claim, yet alone the jurisdictional amount.  The
court grants defendants summary judgment on this count.

### HOLDING XIII--COUNT X-FRAUD--SUMMARY JUDGMENT FOR DEFENDANTS ADS, CMS, DUPREL, CHAMBERS AND GATHERUM

In Count X plaintiff claims defendants ADS, CMS,
Duprel, Chambers and Gatherum misrepresented material facts to
DHS causing it severe financial loss.  DHS claims the following:

1) Defendants deceived DHS by concealing from DHS
   that between March 1995 and August 1995 defendant
   Gatherum discussed with defendants Duprel and/or
   Chambers the prospects of taking the Alabama
   prison work away from DHS and giving it to them;

2) Defendants Duprel and Chambers intentionally de-
   ceived DHS by concealing the fact they were
   setting up a competing business while still in the
   employ of DHS; and

3) Defendant Chambers deceived DHS by concealing he
   intended to breach the restrictive covenants.

The court has previously dealt with the third claim: no restric-
tive covenants, therefore, no deception or concealment of
intention to breach restrictive covenants.  Defendant Chambers
was an employee-at-will and was not subject to restrictive
covenants.

Alabama law has consistently held that in order for a
fraud action to stand the plaintiff must have suffered damages.
The elements of fraud are:  1) a misrepresentation of a material
fact; 2) made willfully to deceive or recklessly without knowl-
edge; 3) which was justifiably relied upon by plaintiff under the

38

circumstances; and 4) damages caused as a proximate result. *Sevier Ins. Agency, Inc. v. Willis Corroon Corp. of Birmingham*, 1998 WL 57760, at 8 (Ala., Feb. 13, 1998), *reh'g denied*, (Mar. 20, 1998). *See also Goodyear Tire & Rubber Co. v. Washington*, 1998 WL 109824 (Ala., Mar. 13, 1998). Plaintiff has presented no evidence of damages sustained from defendants' actions and the court holds accordingly. The contract was already lost and rightly so. DHS damaged itself and is responsible for the loss of its contract with CMS.

### HOLDING XIV--COUNT XI--UNFAIR COMPETITION--SUMMARY JUDGMENT FOR DEFENDANTS ADS, DUPREL, CHAMBERS AND GATHERUM

The count grants defendants summary judgment on count XI as a matter of law. There is no generic tort of "unfair competition" in Alabama under current law. The tort of unfair competition, a form of interference, has been subsumed by the tort of interference with business relations, previously discussed. *City Ambulance of Alabama, Inc. v. Haynes Ambulance of Alabama, Inc.*, 431 So. 2d 537, 539 (Ala. 1983).

HOLDING XV--COUNT XII--BUSINESS DEFAMATION[36]--SUMMARY JUDGMENT
FOR DEFENDANTS DUPREL, CHAMBERS AND GATHERUM

The court grants defendants summary judgment as a
matter of law on the claim of business defamation found in count
XII.  There is no evidence of any false or defamatory statement
concerning DHS made by Gatherum or anyone at CMS.  Brotz, him-
self, testified that the count was not based upon any particular
statement of CMS to Gatherum, but more generically upon the
"harm" to DHS's business caused by the contract termination.
Goldhecht testified that there was no statement made by Gatherum
that defamed or harmed DHS.  Even were such evidence before the
court the defendants would only be liable for actual injuries
sustained by DHS resulting from their statements.  The evidence
before the court shows that the plaintiff alone is responsible
for losing the contract by its failure to perform the contract
conditions, not as a result of any defamatory statements of
defendants.  Accordingly, the court grants defendants summary
judgment on this count.

Because the court is entering a final judgment it is no
longer necessary to certify the case to the Eleventh Circuit.

---

[36]  Although plaintiff has tried to dismiss the count in a
brief, the court has denied the later filed motion preferring to
rule on the merits.

40

An order consistent with this opinion is being entered contemporaneously herewith.

DONE and ORDERED this _29th_ day of July 1998.

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.

41